382 A.2d 526.

STATE *vs.* RONALD J. JALETTE.

JANUARY 18, 1978.

PRESENT: Bevilacqua, C.J., Paolino, Joslin, Kelleher and Doris, JJ.

KELLEHER, J.  The defendant, Ronald J. Jalette, stands convicted by a Superior Court jury of committing an indecent assault upon his 8-year-old daughter, Lisa. In his appeal from this conviction, the defendant makes three basic contentions, only two of which merit our consideration. They are: (1) that the jurisdiction to hear this case was vested in the Family Court rather than the Superior Court; and (2) that certain testimony was improperly admitted.

Lisa was the first witness to be called by the prosecution. She testified that in September of 1974 she was living in Woonsocket with her father, her sister, and a girl friend of her mother. At this time, Lisa's mother was a patient at a local hospital. According to Lisa, one evening her father asked her to watch him take a shower. After the shower, her father took Lisa into his bedroom and asked her to watch a black and white chart which was on the wall. Her father then told her to take off her pajamas. He took off his own robe and for a "couple of minutes" he touched Lisa in her "private places."

In cross-examination, defense counsel unsuccessfully attempted to suggest through its interrogation that Lisa was to receive some reward in exchange for her testimony.

The prosecution also presented the testimony of Mrs. Jalette and a Woonsocket policewoman. Their testimony will be detailed as we consider the trial justice's ruling on the evidentiary portion of this appeal.

The defendant testified on his own behalf and told the jury that he never fondled his daughter. He admitted that on the night in question he and his daughter were on his bed

but maintained that they both were fully clothed. Jalette described himself as an amateur hypnotist and stated that he was trying to hypnotize Lisa by using a black and white chart, which he referred to as a "hypnodisc." When asked why he wished to hypnotize his daughter, defendant stated it was "curiosity." He also insisted that when he asked Lisa about the accusations she had made against him, she replied "she wasn't sure if it was a dream or if it really happened."

## I. The Jurisdictional Issue

We need not dwell at length on defendant's assertion that his criminal prosecution in the Superior Court should have been transferred to the Family Court pursuant to G.L. 1956 (1969 Reenactment) §8-10-4. That section provides:

> "§8-10-4. Criminal cases referred to family court. — To said family court shall also be referred for hearing, adjustment, reconciliation, decision and sentence all causes properly brought in said court or appealed from other courts in which the defendant is accused, as provided by the statutes of * * * assault, assault and battery, or assault with a dangerous weapon, or attempt at such assault, upon the defendant's wife or husband or children, or upon a parent by his child."

Nowhere does this statute refer to the crime with which defendant was charged, "indecent assault on child." General Laws 1956 (1969 Reenactment) §11-37-6. The defendant's contention that §8-10-4 refers to a wide range of assaults misses the mark. The assaultive conduct described in §8-10-4 refers to those conditions to which specific reference is made in chapter 5 of title 11, which is entitled "Assaults." The offense with which defendant is charged, indecent assault on a child, does not fall within the classification of the criminal conduct enumerated in chapter 5. Rather, it is to be found in chapter 37, which is entitled "Rape and Seduction." It is our belief that the Legislature, by the specificity which it displayed in its enactment of §8-10-4, never intended that trials of indecent assault

charges would by heard in the Family Court. *See Dutton v. Langlois*, 104 R.I. 528, 247 A.2d 86 (1968); *State v. Perry*, 103 R.I. 6, 234 A.2d 115 (1967).

## II   The Evidentiary Rulings

This case presents substantial questions regarding the extent to which out-of-court statements made by a minor sexual offense victim may be admitted as evidence against the alleged assailant.

The mother testified that she called home on September 26, 1974, at 6 p.m., which was approximately 22 hours after the alleged assault. Lisa answered the phone, and when her mother asked how she was, she responded, "Okay." When Mrs. Jalette then asked Lisa how things went at school, Lisa began to cry and informed her mother that her father made her go to school after telling her she would have a holiday. The mother asked Lisa if she had not planned on going to school because she was sick and, according to Mrs. Jalette, Lisa replied: "You know, mommy, what happened to me in Delaware, daddy said that he would never do that again? Well, it happened again." Later, in various portions of her direct testimony the mother described the Delaware incident by saying that her daughter played "strip poker" with the father, that the father "molest[ed]" Lisa, and that he kissed her and she kissed him in his "private area."

The police officer reported that she questioned Lisa at police headquarters a day and a half after the alleged assault. At some time during the interview, she reported, Lisa became upset and started to cry as she told the officer that her father had undressed her and rubbed his hands over "her private area."

The defendant made timely objections to both of these testimonials on the basis of their hearsay qualities. The trial justice ruled that they were spontaneous utterances, and they became part of the record.

Hearsay, as we have said, is an out-of-court utterance offered to prove the truth of the matter asserted. *State* v. *Palmigiano*, 112 R.I. 348, 309 A.2d 855 (1973); *State* v. *Vaccaro*, 111 R.I. 59, 298 A.2d 788 (1973); *Allen* v. *D'Ercole Construction Co.*, 104 R.I. 362, 244 A.2d 864 (1968). It is obvious from the record that the testimony of the mother and the officer was being offered for the purpose of proving the indecent assault charged in the indictment.

The spontaneous utterance exception to barring the use of the hearsay rule is well recognized today. The exception is premised on the assumption that the excitement of certain startling events stills the reflective faculties and removes their normal controls. A spontaneous utterance occurring at the time of a so-called startling event is thought to be a sincere, truthful response to the actual sensations and perceptions produced by the preceding external shock. 6 Wigmore, *Evidence* §1747 at 195 (Chadbourn rev. ed. 1976).

Incidents involving rape or other sexual offenses have long been viewed as presenting unique circumstances when the spontaneous utterance exception is sought to be applied. 6 Wigmore, *supra* §1760 at 240. In general, a less demanding time aspect is required. McCormick, *Evidence* §297 at 709 (2d ed. 1972). This is particularly true when the victim is a child of tender years. *People* v. *Davison*, 12 Mich. App. 429, 163 N.W.2d 10 (1968).

This court has emphasized that a spontaneous exclamation may be admitted into evidence even if not strictly contemporaneous with the exciting cause if, from a consideration of all the facts in the case, it appears that the declarant, when he or she spoke, was still laboring under the stress of the nervous excitement engendered by the event he or she describes. *State* v. *Howard*, 114 R.I. 731, 339 A.2d 259 (1975); *State* v. *Vaccaro, supra; State* v. *Mancini*, 108 R.I. 261, 274 A.2d 742 (1971); State v. *Nordstrom*, 104 R.I. 471, 244 A.2d 837 (1968). The admissibility of statements pur-

porting to be spontaneous utterances is a matter which is vested in the sound discretion of the trial justice. *State v. Medeiros*, 117 R.I. 33, 360 A.2d 867 (1976).

Despite the liberality with which we view the excited utterance exception, particularly in a sex offense, we cannot sanction its use here. The record clearly indicates that neither of Lisa's statements falls within the recognized exception. In permitting Lisa's mother to tell the jury about the Delaware episode, the trial justice remarked that his decision was based on what he had heard "from the witness stand." In expanding on this comment, the trial justice continued: "I cannot close my eyes, and do not close my eyes, to my own observation of the child when she was on the stand, because her testimony and her appearance on the stand have played a vital, extremely vital, factor in the ruling which I have made on this question." Later, when the defense objected to the introduction of Lisa's reply to the police officer's questioning, the trial justice once again stressed the importance of Lisa's courtroom appearance and demeanor. In taking this position, the trial justice erred.

While there is no explicit rule as to what constitutes an admissible spontaneous utterance, it is recognized that each statement must be considered within the context of the circumstances which prevailed at the time of its utterance. *State v. Kenna*, 117 N.H. 305, 374 A.2d 427 (1977); *State v. De Paola*, 5 N.J. 1, 73 A.2d 564 (1950); *Commonwealth v. Harris*, 351 Pa. 325, 41 A.2d 688 (1945); *State v. Daba*, 75 Wash. 2d 234, 450 P.2d 183 (1969); *State v. Smith*, 36 Wis. 2d 584, 153 N.W.2d 538 (1967). Wigmore refers to this criterion as the "circumstantial guarantee" of "special trustworthiness." 6 Wigmore, *supra* §1749 at 199. The trial justice's impression of Lisa's courtroom appearance is totally irrelevant in determining whether her mother or the policewoman could tell the jury what Lisa had told them.

When the prosecution attempted to offer evidence of these conversations, it then assumed the burden of establishing the admissibility of each conversation. *State v. Hem-*

*phill*, 504 S.W.2d 62 (Mo. 1974). The state then had to prove that each utterance was a spontaneous verbal reaction to some startling or shocking event made at a time when Lisa was still in the state of nervous excitement produced by that event and before she had time to contrive or misrepresent. Proof of spontaneity was to be adduced from an evaluation of the circumstances existing at the time of Lisa's conversations, not how she appeared or performed over a year later at trial. The trial justice's repeated emphasis on the importance of Lisa's courtroom appearance is, in our opinion, a significant indication of his doubt as to whether the testimony surrounding the September 26, 1974 telephone call was sufficient in and of itself to support the admission of the mother's report of what had transpired in Delaware.

As we make our independent consideration of the circumstances surrounding Lisa's telephone report, we note that it came approximately 22 hours after the Woonsocket fondling incident. She had spent the greater part of the day of September 26, morning and afternoon, at school, where we assume she participated in the usual school-day routine. Initially, Lisa told her mother she felt "Okay." A few questions later, the tears began to flow, and Lisa became upset as she told her mother that she had to go to school when, the night before, her father had promised her a holiday.

The use of such terms as "tears," "nervous," or "upset" are not to be the "open sesame" to having a declarant's statement classified as a spontaneous utterance. Having in mind the 22-hour lapse between the fondling and the mother's phone call, the time spent at school, Lisa's "Okay" feeling, the question and answer technique, and Lisa's complaint about having to go to school, we find that the prosecution failed to show that at the time Lisa spoke to her mother the sway of the previous evening's event still dominated and controlled her reflective powers.

The police station episode stretches the spontaneous utterance exception far beyond its breaking point.[1] The

mother had testified that she had called the Woonsocket police shortly after she had finished her phone conversation with Lisa. Police records indicate that a detective came to the hospital and interviewed the mother. When Lisa appeared at police headquarters on the following morning, September 27, she was accompanied by her sister and her aunt. During the initial phase of her interrogation, Lisa was dry-eyed. The tears came once the officer asked Lisa to tell her what Lisa had told the mother on the previous evening. There was nothing spontaneous in what Lisa said. She was at headquarters for the specific purpose of telling the police what she had already told the mother. It is obvious from the officer's testimony that Lisa had already told the mother about the father's fondling. When Lisa arrived at the station, she had already given details of the fondling incident to her mother. The answers she gave to the officer's questions were neither instinctive nor impulsive. The tears that she shed at the station could be attributed to a variety of reasons: fear at being in the station, remorse that she was about to involve her father with the police, and shame that she would have to repeat this story to strangers. A spontaneous declaration has been described as "really an effu-

---

[1]In permitting the policewoman to repeat Lisa's responses to her questions, the trial justice said that he was relying on the spontaneous utterance exception and the so-called fresh complaint rule, which is usually applied in rape and morals cases. The rule permits the prosecution to show that the victim complained within a reasonable time to someone he or she would ordinarlily turn to for sympathy, protection or advice. This type of proof may be used in three different situations. First, it may be admitted to forestall the assumption that since there is no evidence that a complaint was made, the offense charged did not occur. In such a situation the complaint, but not its details, is admissible. The second situation permits rehabilitation of the prosecution's witness after he or she has been impeached. The prosecution can then show that the witness had made statements shortly after the incident which are consistent with his or her testimony. Here, the details of the complaint are admissible. The third situation is where the utterance satisfies the spontaneity requirement. There, the details are admissible, and impeachment is immaterial. *See State* v. *Balles,* 47 N.J. 331, 221 A.2d 1 (1966). The trial justice apparently abandoned any reliance upon the rule because at no point in his charge did he ever direct the jury's attention to its applicability.

sion." *State* v. *Hutchison,* 222 Ore. 533, 537, 353 P.2d 1047, 1049 (1960). We see nothing effusive in the manner in which Lisa comported herself during the time she was in police headquarters on the morning of September 27, 1974.

The fact pattern here forms a far different picture from that presented to us in *State* v. *Nordstrom,* 104 R.I. at 475-77, 244 A.2d at 840-41, where we discussed at length the spontaneous utterance exception. There, "Ann," a 5½-year-old girl, was found by the police the day after she had been sexually assaulted and had apparently spent the night with the defendant. She was taken immediately to the police station and soon reunited with her mother. As soon as "Ann" saw her mother, she ran instinctively into her arms and cried as she told of her harrowing experience. It cannot be said that Lisa's remarks to her mother and the police officer were uttered while she was still laboring under the stress of having been molested by her father in their Woonsocket home.

We do not mean to imply that statements made by a victim 1 or 2 days after the alleged crime can never be classified as spontaneous. As we have made clear in the past, the delay in time between the exciting event and the utterance is only one factor to be considered. However, we do hold that in order to properly invoke the spontaneous utterance exception, the proponent must show that the statements made were spontaneous responses to the stress of an exciting event. The prosecution simply has failed to sustain its burden in this regard.

Having decided that the admission of this portion of the mother's. and policewoman's testimony was erroneous, we must reverse because we feel that there was at least a reasonable possibility that this evidence could have influenced the jury's verdict. *State* v. *Bower,* 109 R.I. 198, 283 A.2d 39 (1971); *State* v. *Mancini, supra.*

We will now consider defendant's objection to his wife's reference to what transpired in Delaware because of the

strong probability that at the new trial the prosecution will again attempt to show that the September 1974 fondling incident was not the first time that Jalette had taken indecent liberties with his daughter.

As a general rule, in prosecuting for a particular crime, evidence which in any way shows or tends to indicate that the accused has committed another crime completely independent of that for which he is on trial, even though it be a crime of the same type, is irrelevant and inadmisible. *State v. Mastracchio*, 112 R.I. 487, 312 A.2d 190 (1973); *People v. Kelley*, 66 Cal. 2d 232, 424 P.2d 947, 57 Cal. Rptr. 363 (1967); *Ross v. State*, 276 Md. 664, 350 A.2d 680 (1976); *State v. Cote*, 108 N.H. 290, 235 A.2d 111 (1967); *Whitty v. State*, 34 Wis.2d 278, 149 N.W.2d 557 (1967). This principle is merely an expression of the rule which bars the state from the initial introduction of evidence of the accused's bad character. *See State v. Guaraneri*, 59 R.I. 173, 194 A. 589 (1937). Thus, the state may not present evidence of other criminal activity by the accused unless the evidence is "substantially relevant for some other purpose than to show a probability that he has committed the crime on trial because he is a man of criminal character." McCormick, *Evidence* §190 at 447 (2d ed. 1972). Moreover, another reason for this exclusionary principle is the prejudicial potential of such evidence, the real possibility that the generality of the jury's verdict may mask a finding of guilt which is based upon involvement with unrelated crimes rather than on the evidence which shows the defendant guilty of the crime charged. *Spencer v. Texas*, 385 U.S. 554, 560, 87 S. Ct. 648, 652, 17 L. Ed. 2d 606, 612 (1967).

However, evidence of other distinct crimes may be admissible if it tends to establish material elements of the prosecution's case such as the accused's intent, motive, plan, or his participation in a felonious scheme such as a conspiracy. *State v. Beaulieu*, 116 R.I. 575, 359 A.2d 689 (1976); *State v. Mazzarella*, 103 R.I. 253, 236 A.2d 446 (1967); *State v. Colangelo*, 55 R.I. 170, 179 A. 147 (1935);

*State* v. *Horton,* 47 R.I. 341, 133 A.236 (1926); *State* v. *Fitzimon,* 18 R.I. 236, 27 A. 446 (1893). In such situations the jury is apprised of the accused's other criminal activity, but the conceded possibility of the prejudice is believed to be outweighed by the validity of the state's purpose in urging its introduction. Such evidence, we have said, is to be received "with great caution" and is to be "carefully restricted" by a specific instruction as to the limited purpose for which such evidence is being introduced. *State* v. *Peters,* 86 R.I. 447, 450, 136 A.2d 620, 621 (1957).

While all courts recognize that evidence of "other crimes" will not be received if its sole purpose is to demonstrate the accused's propensity to commit the crime charged, there has been a marked tendency to admit this type of evidence for precisely this purpose in cases involving sexual offenses. Some jurisdictions have permitted the prosecutor to show the accused's inclination or disposition toward sexual misbehavior without regard to whether the victim or partner is the same person involved in the crime which is now being tried. Courts which have permitted evidence of other offenses with persons other than the victim or partner have observed that such evidence is demonstrative of an accused's "emotional propensity for sexual aberration,"[2] or "lewd disposition,"[3] or "propensity to act out his sexual desires with young girls,"[4] or "moral disposition and perversity."[5] Other jurisdictions will not allow evidence of other sexual offenses involving different persons or partners. *People* v. *Greeley,* 14 Ill. 2d 428, 152 N.E.2d 825 (1958); *State* v. *Erich,* 198 Neb. 1, 251 N.W.2d 381 (1977); *State* v. *Mason,* 79 N.M. 663, 448 P.2d 175 (1968). However, most courts do

---

[2]*State* v. *Phillips,* 102 Ariz. 377, 379, 430 P.2d 139, 141 (1967).

[3]*State* v. *Maestas,* 224 N.W.2d 248, 251 (Iowa 1974).

[4]*State* v. *Tarrell,* 74 Wis. 2d 647, 658, 247 N.W.2d 696, 703 (1976).

[5]*State* v. *Shively,* 172 Ohio St. 128, 131, 174 N.E.2d 104, 107 (1961).

allow evidence of other sex offenses with the same person on the theory that such evidence shows the accused's incestuous and lustful attitude toward that particular person. *People* v. *Kelley; People* v. *Greeley,* both *supra; State* v. *Beckwith,* 158 Me. 174, 180 A.2d 605 (1962); *State* v. *Di Giosia,* 3 N.J. 413, 70 A.2d 756 (1950); *Berger* v. *State,* 179 Md. 410, 20 A.2d 146 (1941). It is generally recognized that courts have extended a greater latitude of proof as to like occurrences when considering sexual offenses than has been permitted in the trial of other criminal charges. 1 Underhill, *Criminal Evidence* §212 (6th ed.); 1 Wharton, *Criminal Evidence* §250 (13th ed.); *see* Annot., 77 A.L.R.2d 841 (1961).

This liberal attitude has been subject to some provocative critical comment. In *Commonwealth* v. *Boulden,* 179 Pa. Super. 328, 344, 116 A.2d 867, 874 (1955), the court, after discussing the rationale for the exclusionary rule and referring to various reports and studies which relate to sex offenders, observed that:

> "sex offenders are no more likely to repeat than other offenders.
>
> "Thus since all the reasons for applying the rule are as applicable to sex offenders as to other offenders, there is no more reason to admit prior offenses to show depravity or propensity in a sex case than in any other case. Nor is there any reason to contort the exceptions to the general rule in order to permit the admission of evidence of a former offense, when in fact the only purpose is to show depravity or propensity." *Id.*

Others have offered similar comments and expressed a concern that a liberalized application of exceptions to the exclusionary rule could cause the conviction of innocent persons. Slough & Knightly, *Other Vices, Other Crimes,* 41 Iowa L. Rev. 325, 333-34 (1956); Note, *Evidence of Similar Transactions in Sex Crime Prosecutions; A New Trend Toward Liberal Admissibility,* 40 Minn. L. Rev. 694 (1956).

It has been recognized that evidence of other sexual behavior is, by its very nature, uniquely apt to arouse the jury's hostility. *People* v. *Kelley, supra.* In *Kelley,* after a thorough discussion of all aspects of the admissibility of proof of similar crimes in sex-related cases, the court ruled that (1) evidence of other not too remote sex crimes with the particular person concerned in the crime on trial may be introduced to show the accused's "lewd disposition or * * * intent" towards the person, (2) evidence that the accused committed nonremote similar sexual offenses with persons other than the victim may be admitted to prove the presence of the traditional exceptions to the general rule, such as intent or motive, with a caveat that evidence of other acts with other persons may be shown on the issue of intent only if it is absolutely necessary, such as instances where the accused admits the act but claims it was an accident or mistake, and (3) any doubt as to the relevancy of such evidence should be resolved in favor of the accused. 66 Cal. 2d at 240-43, 424 P.2d at 954-56, 57 Cal. Rptr. at 370-73.

We are extremely conscious that the indiscriminate use of "other crimes" evidence poses a substantial risk to an accused's right to a fair trial. We adopt the holding in *Kelley* with the admonition that this type of evidence should be sparingly used by the prosecution and only when reasonably necessary. *Whitty* v. *State, supra.* The trial court should exclude such evidence if it believes it is purely cumulative and not essential to the prosecution's case. Evidence of other crimes is admissible only when it tends to show one of the exceptions to which we have previously alluded and only when that exception is relevant to proving the charge lodged against the defendant. *State* v. *Curry,* 43 Ohio St. 2d 66, 330 N.E.2d 720 (1975). In seeking to attain this particular goal, the trial court may insist that the prosecutor point to the specific exception on which he relies and show how that exception relates to the pending charge. In its charge the trial court should not take a scatter-shot approach and list all of the exceptions to the exclusionary rule. Rather, it shall

designate with particularity the specific exceptions to which the "other crimes" evidence is relevant and delete from its charge the remaining exceptions. Assuming that evidence of other crimes will be admitted, attention should be paid to the manner in which this evidence is presented to the jury. A witness should not be questioned about the details of the accused's other misbehavior, and the prosecutor's references to such matters as he argues to the jury should be kept to a minimum. In this sensitive area of the law, the trial court can do much to strike a proper balance. The observations we have made are not all-inclusive. We recognize that a vigilant trial court making use of its expertise and ingenuity can do much so that a proper balance will be struck between the prosecution's right to present necessary and relevant evidence and the accused's right to have his guilt or innocence determined by an impartial jury, free from the disruptive influences which accompany irrelevant, prejudicial, and extraneous evidence.

The defendant's appeal is sustained, the judgment of conviction appealed from is vacated, and the case is remitted to the Superior Court.

Mr. Justice Paolino participated in the decision but retired prior to its announcement.

*Julius C. Michaelson*, Attorney General, *John R. McDermott*, Special Assistant Attorney General, for plaintiff.

*William F. Reilly*, Public Defender, *Barbara Hurst*, *John A. MacFadyen III*, Assistant Public Defenders, for defendant.